TRULINCS 67873379 - STUBBS, TIMOTHY JOHN - Unit: ENG-J-B

-------------------------------------------------------------------------------------------

FROM: 67873379
TO:
SUBJECT: Objections to Facts Relevant to Sentencing
DATE: 09/22/2017 02:18:50 PM

FILED
UNITED STATES DISTRICT COURT
DENVER, COLORADO

SEP 27 2017

JEFFREY P. COLWELL
CLERK

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLORADO

UNITED STATES OF AMERICA                    CASE # 13 CR00439-CMA

    vs.

TIMOTHY J. STUBBS

---

OBJECTIONS TO FACTS RELEVANT TO SENTENCING

---

Defendant hereby objects to the following:

Para. 10 - "The defendant lived an extravagant life....." the defendant purchased almost $360,000 in gold and approximately $10,000 in silver. ....
    The defendant did have the home on Red Rim drive. The property in Kona was as co-purchaser, to assist his sister in buying a home, this was not a residence of the defendant. The property in Crested Butte was a vacation rental, NOT a vacation home, it was a business enterprise, not a residence. The purchase of gold and silver was done in a transparent manner, as government exhibits demonstrate. The income used was tracked through Quick Books, deposited in the bank and the purchases made via wire transfer, ALL in an open and transparent manner.

Para. 12 - "Meanwhile, the defendant was sent at least 25 notices by the IRS.... "
    There exist NO evidence that any notice was ever received by defendant and in fact the last time defendant contacted the IRS they had the wrong address for him. The IRS failed to deliver ANY proper notices to the defendant!

Para. 13 - "Rather than pay himself a wage, the defendant paid his personal expenses through business bank accounts. ...."
Due to the defendants lack of knowledge, experience or accounting education, he did not know or understand that this may not be proper. As the sole stock-holder, he saw nothing wrong with paying his bills from his business. In any event, all this activity was tracked through the Quick Books and banking records, all in an open and transparent manner, there were no efforts to conceal the income or the payments.

Para. 14. "He further concealed the nature of his income by making four separate purchases of gold and silver."
    The purchases, as evidenced, were made via bank wire, all transparent and open. The income, purchases, bank deposits and payments were all recorded in Quick Books and open banking records, there was no concealment whatsoever. The mere purchase of gold and silver, a hedge investment by the defendant, is in no way a concealment of income, which was all recorded and tracked in a transparent manner.

Para. 15 - "At trial, the evidence proved..... that monies paid to NRF was not income to NRF and was not reportable to IRS."
To the defendants limited, best knowledge the monies paid were not income, NRF was not an employee or sub-contractor of the 'dealer' and the monies should be considered marketing expense as the dealer was offering the rebate as an incentive, much like offering any other incentives, such as a "free trip" voucher, restaurant vouchers or other similar incentives that dealers normally offer in the operation of their businesses.

Para. 18 - "The defendant remains defiant and non-compliant with federal tax rules and regulations. During the pendency of this matter the defendant requested relief from the court's curfew to purportedly attend a work conference."......
    The defendant asked for and received permission to attend an 'estate and trust' seminar, not a 'work' conference. The seminar curriculum was taught 90% from the IRS Manual, it was NOT a tax protester seminar. The defendant did NOT advertise the seminar, the Facebook Posting was done by someone else. Defendant solely acted as host, the presenter stayed at the home with defendant and made office space available. The scheduling of Jonah Bey and bringing him to Colorado was due to the efforts of other people, they initiated the seminar and needed assistance with space as they were not in convenient locations. (Aspen/Glenwood Springs) "Donations" were accepted to compensate Jonah Bey for the travel expenses and defendant assisted with receipt of such to offer a convenient, local source for attendees. All proceeds were given to Jonah Bey

TRULINCS 67873379 - STUBBS, TIMOTHY JOHN - Unit: ENG-J-B

-------------------------------------------------------------------------------------------------------

to cover his expenses.  Defendant assisted in this manner to gain some personal time with Jonah Bey who normally charges $80/hr for consulting, which defendant could not afford.  By assisting with the seminar he was hoping to gain education with "Constitutional Challenge" methodology that Mr. Bey had found success with in other legal matters.  This was a fully legitimate presenter and topic.

Para. 20.  "The Government indicates that the defendant failed to report more than $10,000 from 'criminally' derived income. ........."
    The Wisconsin Case, No. 07-CX-43 was a CIVIL case and never rose to the level of ANY criminal charges.  The resulting judgment was awarded for "deceptive" and "misleading" business practices.  There was a similar Colorado case, ALSO 'civil', no 'criminal' charges were ever made.  (Neither case was ever adjudicated) The Government may not just change the definitions of civil to criminal to enhance the charges to suit their desires. (bad faith) Attached is a Sample Rebate Voucher for the court, which entails the entire program.  Every Consumer received this FULL Disclosure of the program PRIOR to making any purchase from a Merchant.  Please note that the VERY first paragraph addresses the potential for a 'shortfall' and then a pro-rated payment, therefore, the allegations of promising full payment as being deceptive are blatantly false.  The defendant feels he would have prevailed had the cases ever been adjudicated, however, after spending almost $250,000.00 in legal fees in WI case, the defendant was advised very late in the proceedings that even if he won at trial, the Legal Fees would not be awarded to allow him to recover his expenses when in a suit with the Government.  He was told by the attorneys that the expected trial expenses would exceed $650,000.00.  The damage to NERF's reputation had already been done solely by the WI Attorney General filing the case and making it public.  Also, WI had made an offer to defendant to settle the case for $120,000.00.  Although feeling very strongly that he could prevail at trial, because the defendant had used 3 Law Firms in two States in the setting up and ongoing review of the program,(including much work by Michael Grattan III, now a Judge in Grand Junction) (also reviewed by attorneys of over 100 Merchant/Dealers) AND due to ALL terms and conditions being clearly stated and provided to the consumers, the defendant decided that since the damage had been done and he could not recover the almost $1 million in legal fees even with a victory, there truly was no winning.  The defendant moved to Costa Rica and allowed WI to gain a default judgment, wherein they rewarded themselves handsomely compared to the offer to settle they had made.  Colorado then jumped on the bandwagon and got their own judgment in a similarly excessive amount.

    The fact is, NRF had paid out almost $450,000.00 to claimants as promised, up to the time of the case proceedings.  Also of note, "Consumers" were not allowed to purchase the rebate vouchers, the dealers were not allowed to charge for them, they were offered as a FREE incentive to the consumers, so the consumer had NOTHING to lose if they failed to claim or to claim properly.  It is a known fact in the industries of rebates and coupons and gift-cards that MOST people will not claim or use the offer of such incentives. ("Slippage") At the time of the closing of NRF, payments had been made in full to valid claimants and as I recall at the moment, only 1 of the pools had a 'shortfall'.  The consumers who claimed properly had a 'windfall' while those that failed to claim or claimed improperly did not LOSE anything, it was a free opportunity.  AS further evidence of the veracity of the reality of "Slippage" (failure of claimants) the State of Colorado eventually ended up with the approximately $4.6 Million that was held in escrow to pay the successful claimants.  They sent out a letter to ALL the remaining voucher holders in order to pay out the escrow fund.  However, even after receiving a letter, from the Government, informing the voucher holders that they would be paid 8% of the face value of their vouchers, a full 33% of those people did NOT claim the money!  The State of Colorado kept $1.5 Million of the escrow!  The agency charged with 'consumer protection' actually STOLE $1.5 Million from these very consumers.  Neither the defendant nor NRF ever received one penny of the escrowed money that was there for the consumers, while the State of Colorado took $1.5 Million.  No consumer EVER paid even one penny to NRF!  In my mind, once they had notified the consumers of the available payment, and not all of them responded (66% response rate) the State and their administrator SHOULD have pro-rated the entire amount held in escrow and paid out MORE than the 8% to those that responded and should NOT have kept $1.5 Million of the 'consumers' windfall!!!  They should have increased the payment from 8% to 12% and paid out the entire Escrow. (I am considering filing a Class Action suit on behalf of the consumers against the State of Colorado, as a friend of the court, to get them to pay out the $1.5 Million they have wrongfully taken from the voucher holders)
    Also of note, many people wrongly thought that when a claim was denied, that NRF would be keeping the funds for itself.  THIS is not correct, (unclaimed or excess funds rolled forward to ensuing monthly pools to be available for payment, terms of the escrow) denial of improper claims PROTECTED the consumers that complied properly with the terms and conditions that they ALL agreed to abide by!  If improper claims were allowed to be paid, that could result in the 'shortfall' and those that complied with the agreement would be paid less, a true loss to them.  The use of words such as 'criminal' income and 'defrauded' are incorrect and create a false characterization that is not of legal substance!  Both the CO and WI cases were "civil"....and were for deceptive, false or misleading, Never rising to the level of Criminal and never proven at trial.

Para. 21 - "the Government indicated the offense involved sophisticated means.  The Government reported at trial, it was proven that the defendant used his business bank accounts to pay personal expenses and obscure receipt of income from the IRS and purchased gold and other precious metals to further hid his income."......
    Even within this statement, this precludes the existence of any sophisticated means or obscuring.  ALL was done via

2/5

TRULINCS 67873379 - STUBBS, TIMOTHY JOHN - Unit: ENG-J-B

---------------------------------------------------------------------------------------------------

transparent and open transactions, recorded in Quick Books and in bank records. I could understand if the Government provided evidence of cash transactions, that were not recorded in the accounting (Quick Books) or deposited in the bank or metals not paid via wire from the bank but paid in cash... that would show an effort to hide income. To transact all of this in an open and recorded manner is in no way using 'sophisticated' means or obscuring or hiding income.

Secondly, as there were no other companies providing the Administrator type of duties in the country, and we looked far and wide, (the deferred rebate program was a unique business) the defendant did incorporate Fund Administrators. As a new, valueless business, it was transferred to Susan Duran and she did provide the services of the Fund Administrator. She would receive and document the voucher claim process and validate claims. She was the true owner and did the requisite duties, and when legal issues were mounting she wanted out. Defendant did buy her out, paying $30,000.00 to her for the purchase just prior to the cessation of both businesses. Again, to say these things were 'part of the Wisconsin fraud' are again a blatant misrepresentation and changing of definitions by the Government, the CO and WI cases were never 'fraud', this was never in the indictment nor the judgment.

3/5

## TRULINCS 67873379 - STUBBS, TIMOTHY JOHN - Unit: ENG-J-B

-------------------------------------------------------------------------------------------------------

FROM: 67873379
TO:
SUBJECT: Objections cont.
DATE: 09/22/2017 01:45:15 PM

Objections to Facts Relevant to Sentencing, continued:

Para. 23  "The defendant absconded from the pretrial supervision and failed to appear for sentencing".
    The defendant acknowledges this is true, but also offers further information for mitigation. (wife's health issues letter to be attached/provided later)  Feeling overwhelmed and panicked by the totality of the issues; my father was diagnosed with stomach and throat cancer in October, 2015 (and later died on March 09, 2016, and I was unable to see him prior, a devastating emotional blow) and the court not considering the constitutional and jurisdictional challenges favorably and then further news that his wife was also facing a life-threatening health issue the defendant returned home to Costa Rica to assist his wife. (Departure-5K2.11,p.s.)  While getting her health issues attended to (I believe saved her life) the defendant made himself available to the authorities. (See attached letter from Costa Rican attorney)  Not just once, but on multiple occasions he presented himself to the Costa Rican Immigration Police.  Even after being arrested and spending 19 days in immigration detention and being informed of pending deportation, the defendant returned to CR Immigration Police offices on April 19th, 2017 as directed by Immigration Police and made himself available for the deportation and return to Colorado.  I felt I could not simply abandon my wife and hope her health was resolved while I sat in prison.  Public health care in Costa Rica is very slow and untimely, many people die while waiting to see doctors.  I was able to arrange and pay for Private Doctors/Healthcare which due to the urgent timeliness for care of the issue, time was the most important factor.  Her family was unable to provide this care.  My father was already dying from cancer, it was too much.  I helped her get her health issues resolved and then presented myself to the authorities for deportation and completion of the issues here in the USA.  I believe my self-surrender and dire circumstances are of mitigation value.

Para. 25/26 - Adjustment for Acceptance of Responsibility
    Defendant did not go to trial to argue guilt and freely admitted the commission of the offenses, even admitting to the offense dating back many years that were not charged.  Defendant went to trial to preserve and assert issues that were not about factual guilt, but Constitutional Challenges, Jurisdiction Challenge and a Good Faith (mens rea) defense.  Defendant also voluntarily went to the IRS offices and initiated the entire investigation when requesting the history of the account back in the summer of 2008.  Also see comments in "Objections to Guidelines - Variance for Acceptance of Responsibility)  Also note the extraordinary circumstances in regard to the Obstructing or Impeding the Administration of Justice wherein the defendant needed to see to the health of his wife. (letter to be provided upon receipt and see comments above, Para.23)

Part C. Offender Characteristics

Defendant wishes to clarify the following:
    65. Substance abuse -
        Defendant first experimented with alcohol and marijuana at age 12.  Throughout his high school years he did consume both on a regular basis.  As an adult he regularly consumed both on an almost daily basis.  Probation made it sound as        if it was only after returning to Costa Rica, but this was basically the defendants lifestyle for all his adult life.

    Employment Record
    73. Defendant does not who "Shannon White" is or how the records became confused.  This must be a similarly named entity and has no connection.

    Financial Condition, Ability to Pay-
    80. Defendant re-asserts he had no illegal gains
    81. Defendant does NOT have any positive monthly cash flow.  Defendant has a wife and step-son in Costa Rica as dependants and is only existing from borrowed proceeds at this time.  Defendants other assets have been used to make whole his mother and sister for their loss of property that guaranteed the appearance bond.

Factors that may warrant Departure -

98. Probation states it has not identified factors that would warrant a departure from the applicable sentencing guideline range.

    Defendant offers additional information that he initiated the IRS investigation when he went to the IRS offices in Grand Junction on or about June 05, 2008 and asked them to look at the records.  The agent at the time was surprised to see that no filings had been submitted since 1992.  This voluntary coming forward by the defendant warrants a departure for accepting

4/5

TRULINCS 67873379 - STUBBS, TIMOTHY JOHN - Unit: ENG-J-B

--------------------------------------------------------------------------------

responsibility. (Departure 5K2.15,p.s.)  Also, while defendant did return to assist his wife in her life-threatening illness, he did surrender himself once the health matters were handled.  This was done to avoid greater harm. (Departure 5K2.13, p.s.)

Respectfully submitted,

Timothy-John; Stubbs

Certificate of Service

I hereby certify that on this 22nd day of September, 2017 the foregoing was mailed from FDC Englewood to the Court for filing via ECF, for a copy to be delivered to all interested parties

5/5

**Your Rebate Entitlement** - Congratulations! This National Rebate Fund Check entitles you to claim up to the amount shown on the face of your check 47 months after the issue date shown on the check subject to all of the following conditions. Funds are collected and held in Escrow for all checks issued by Merchants. Funds are invested in 100% U.S. Treasury Bills guaranteed by the government and held in said account to pay future claims ("The Fund"). If the total value of valid claims made in any month is smaller than the total amount in The Fund held for that month, all valid claimants will be paid 100% of the amount shown on the face of the check. If the total value of valid claims made is greater than the total amount in The Fund for that month ("Shortfall"), the funds will be divided on an equal percentage basis among the valid claims and you will be notified of your option to accept payment for that amount immediately, or to defer your claim another year and until the full face value is available ("Defer Until 100%").

| Rebate Check Stub   12.01.2005 | National Energy Rebate Fund, Inc. | CHECK #  1234567  12.01.2005 |
|---|---|---|
| I am the person named on this check and confirm that I have read the conditions of the Rebate Program and agree to be bound by them. | 851 Grand Avenue, Grand Junction, CO 81501 | Date Issued: 06/01/2001 |
| CHECK#     1234567 | Pay To:_____ | $ |
| Name_____ | Address: | |
| Address:_____ | | |
| Phone: _____  DOB: | Description of Goods | Merchant Information |
| Amount:_____  Date: | | |
| Merchant:_____ | | |
| Signature: | | |

SAMPLE

## REBATE PROMOTION CONDITIONS

A. **About us** - National Rebate Fund - We are a Colorado corporation whose address is 851 Grand Avenue  Grand Junction, CO 81501  USA

B. **About the Promotion** - We have agreed with the merchant above that it and its dealers may issue Rebate Checks to people who have purchased, leased or taken on credit certain goods or services for non-commercial use. The Merchant has entered into an agreement with National Rebate Fund to use this promotion and has agreed to make payment to National Rebate Fund for their issue of all promotional checks. No more than three Rebate Checks may be issued to any one person. The amount shown on the Rebate Check may not exceed $7,000.00. No Rebate Check may be issued to any person, firm or corporation involved in the organization, the Fund Administrator or marketing of this promotion. The conditions of this Rebate Check constitute an agreement between the check holder(s) named on the face of the check and National Rebate Fund. **Once the check has been issued and paid for by the Merchant the Merchant shall have no further liability for the promotion subject to compliance with the Merchant's agreement with National Rebate Fund.** By signing the Check Stub and returning it to the Fund Administrator Address, you confirm that you have received our explanatory brochure and have read and fully understood these Conditions and agree to be bound by them.

C. **Your Rebate Check** - You have purchased, leased or taken on credit the goods or services briefly described on the Rebate Check (the "goods") from the Merchant or the Dealer named above. You may therefore claim from us up to 100% of the amount shown on this Rebate Check provided that all these Conditions are satisfied.

1. You must ensure that the relevant sections of both this Rebate Check and Stub are accurate and complete. You must sign and date the Check stub where indicated. You must not have been charged any amount by the Merchant or the Dealer for this Rebate Check over and above their normal selling price for the relevant item.

2. You must return the original Check Stub section of this Rebate Check by USPS registered mail to the Fund Administrator address: 2139 North 12th St. Unit 8, Grand Junction, CO 81501. It must be received at the Fund Administrator address at any time on or before the 17th day after the Issue Date shown above.

3. You must exercise your right to claim by sending this original Rebate Check by USPS registered mail to us at the Fund Administrator Address. Claim Check must be received at the Fund Administrator address no earlier than forty-seven months after the Issue Date and no later than 30 days thereafter, together with:

(a) the original bill of sale, lease, contract, credit agreement, or other proof of purchase obtained from the Merchant or Dealer for the item (or copy signed by Merchant);

(b) a photocopy of your valid passport, or driving license as proof of your identity - you must sign the photocopy to confirm it is a true copy of the original document;

(c) a copy of a recent utilities bill as proof of current address; and

(d) the original return receipt as proof that the Check Stub had been sent to, and received by, the Fund Administrator within the time limit specified by registered mail.

(e) If you comply with all of these Conditions, we will, within six weeks of your claim, pay you up to 100% of the amount shown on this Rebate Check. You may make only one claim under this Rebate Check and must provide all required documents and information at the same time as you make that claim. (No documents will be returned)

4. We shall not be obliged to make any payment to you if we have reasonable grounds to believe that you have been reminded, assisted or encouraged by your merchant, the media or any reminder service or venture to make any registration or claim under this Rebate Check, whether or not that service or venture is provided on a commercial basis, free of charge, or otherwise—with the exception of the 23 Month Reminder sent to you by the Fund Administrator.

5. We shall only be bound to honor any claim for payment if:

(a) the claim is made by you and in good faith;

(b) no more than three Rebate Checks have been issued to you and you return all check stubs and rebate check claims separately;

(c) the amount shown on the face of the check does not exceed $7,000 and does not exceed the purchase price of the goods or services;

(d) within 21 days of moving you file a notice of change of address with the Fund Administrator if you move prior to making your final claim;

(e) you are not a person, firm or corporation who is involved in the organization, Fund Administrator or marketing of this promotion. We shall not accept any claim where the item has been returned to the Merchant or any of its Dealers within twelve months of the date of purchase, lease or hire agreement, for a complete or partial refund of the price paid for it. We may require verification from the Merchant or any of its Dealers and may postpone payment pending receipt of such verification.

6. In a "Shortfall" month you may either accept the offer to "Defer Until 100%" within 17 days, or receive immediate valid and final payment of available funds by default.

7. You must strictly comply with all Rebate Promotion Conditions and time limits specified herein and failure to do so will invalidate any and all of your claim(s).

8. Once a claim has been validly paid or declined all obligations of National Rebate Fund, Inc., and the Fund Administrator to you will have been satisfied. All decisions regarding claims will be made by the Fund Administrator strictly in line with the conditions of this promotion herein and will be final and binding on all parties.

9. The construction, validity, interpretation and performance of this Rebate Check and all matters relating to it shall be governed by the Laws of the Constitution of the United States of America as it stands in the Republic of Colorado and subject to its original jurisdiction.

10. Your rights under this Rebate Check and these Conditions are personal to you. You may not transfer any of them to anyone else.

11. We have not authorized the Merchant or the Dealer or any of their staff to make any representations or statements concerning us or this Promotion other than those that are set out here. You may not rely on any representations or statements which change any of the Rebate Promotion Conditions in any way.

12. In this Rebate Check (including these Conditions) the "Fund Administrator Address" means: 2139 North 12th St. Unit 8, Grand Junction, CO 81501 or such other address as we may from time to time notify you. Any notice given by us to you shall be properly given if sent to you by mail at your address as shown on the Check Stub or as otherwise notified by you in writing to the Fund Administrator.

# franklin morera sibaja
## <u>Abogado - Notario</u>

100 Mts Norte, 50 Este,                    Tel.: (506) 2290-10-59
50 Mts Norte, Antiguo Chicote,             Fax.: (506) 2290-20-03
San José, Costa Rica                       Email.: licmorera@yahoo.com

August 17, 2017.

To whom it may concern,

On the following dates, I atended Mr. Timothy Stubbs in my legal office or visited with him the central offices of Immigration Department in San Jose, Costa Rica. Most of the time he visited Immigration along with his wife Lyn Connia "Connie" Mongrillo Herrera. I was doing for him all the legal process in order for him to renew his residency in Costa Rica. The date are:

February 2, 2016 at 1 pm in my office.
February 25, 2016 at noon in my office.
March 9, 2016 at 8 am in Immigration.
April 15, 2016 at 11 am in Immigration.
June 6, 2016 at 2 pm in Immigration.
July 13, 2016 at 10 am in my office.
July 15, 2016 at noon in Immigration.
August 4, 2016 at 1:30 pm in Immigration.
August 16, 2016 at 10 am in my office.
September 9, 2016 at 11:30 am in Immigration.
February 24, 2017 at 3 pm in Immigration.
April 4, 2017 at 10 am in Immigration.

Sincerely,

Franklin Morera Sibaja,                    Lyn Connia Mongrillo Herrera
Attorney at Law

Citizen
Natural

IRS Form
56
Notice of Fiduciary Relation

B. Cert. — Certification of a Federal Municipal
3) Person that was created & named after me.
2) (citizen)
I'm not 1) Fed, Territorial citizen

I do not consent to being as such, where do you find the Authority to address me, a living breathing man — therefore you have no jurisdiction

I have surrendered the Municipal Citizen ... (Authenticated - B.C.) and Form 56 & provided the "Bond" & have Indemnified My self, against claims against Muni. Person ① Filed the Expatriation (Forms

You can't claim I am a Foreign Citus Trust belonging to you or abandoned for your Benefit

I have the prima facic evidence of the B.C. Trust, which I endorsed to the US. Treasury (for settlement & closure of any/all claims)



Ministerio de Gobernación y Policía
## Dirección General de Migración y Extranjería
Servicio, Justicia y Transparencia

---

### DIRECCIÓN DE LA POLICÍA PROFESIONAL DE MIGRACIÓN

## POR TANTO

Por lo anterior, procede ordenar la ejecución de la deportación dictada mediante resolución número **135-2017-256-DPI-DPPM,** de diez horas del doce de abril de dos mil diecisiete, de conformidad con los artículos 1, 13 incisos 16) y 18); 18'inciso 4); 128 incisos 1), 3) y 4) y 210 de la Ley General de Migración y Extranjería, Número 8764, esto en concordancia con los Votos de la Sala Constitucional 2008- 14857 de las ocho horas cuarenta y tres minutos del 07 de octubre del 2008, 2008-14987 de las nueve horas treinta y un minutos del diez de octubre del 2008, y 2009-15859 del 16 de octubre del 2009, esto en sustento del efecto erga omnes de las resoluciones de la Sala Constitucional, según lo reza el artículo 13 de la Ley de la Jurisdicción Constitucional.

**GISELA MARÍA YOCKCHEN MORA**
**DIRECTORA GENERAL DE MIGRACION Y EXTRANJERIA**

Elaborado por: mfonseca
Revisado por:

---

Al ser las __12:33__ horas con __33__ minutos del día __12__ de __04__ del año __2017__ se notifica la presente resolución al señor de apellido **STUBBS** de nombre **TIMOTHY JOHN,** quien se da por enterado y firma.

FIRMA: _____Se nego A Firmar_____

NOTIFICA (nombre y firma) ___Jonathon Castro Grijalba___

---